# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
April 10, 2012 Session

## STATE OF TENNESSEE v. FREDERICK GREENE

**Direct Appeal from the Criminal Court for Shelby County**
No. 09-05927     James C. Beasley, Jr., Judge

No. W2011-01180-CCA-R3-CD  - Filed June 27, 2012

A Shelby County jury convicted the Defendant-Appellant, Frederick Greene, of first degree premeditated murder.  Greene was sentenced to life imprisonment without the possibility of parole according to a sentencing agreement.  On appeal, he argues that (1) the evidence, specifically of premeditation and intent, was insufficient to support the jury's verdict and (2) the trial court erred in denying his request to instruct the jury on self-defense.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

Robert L. Parris (on appeal and at trial) and Charles Mitchell (at trial), Memphis, Tennessee, for the Defendant-Appellant, Frederick Greene.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel, Assistant Attorney General; William L. Gibbons, District Attorney General; Pamela Fleming and Reginald (Reggie) Henderson, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Trial.**  Greene was indicted for first degree premeditated murder following the February 11, 2009 homicide of Charles Willingham, Jr., the victim in this case.  He was tried on April 4 through 8, 2011.

Tikieta Williams testified that on February 11, 2009, she lived in a house at 766 Rosemont in Memphis with her children and grandchildren.  She had previously been in a

romantic relationship with Greene, and Greene moved into the house with Tikieta[1] when she bought it in the summer of 2007 after the pair lived for a few weeks with Marcus and Lakeydra Brown, Greene's brother-in-law and sister, at a nearby house on Rosemont. Greene lived at Tikieta's house for approximately one year, in which time he would be there "on and off," staying for a few days at a time. By the summer of 2008, Tikieta and Greene had ended their relationship, and Greene was no longer welcome to stay at the house.

Tikieta testified that Greene came to her house unexpectedly on the morning of February 11, 2009. He was not working and was "moving around from place to place." He asked to leave some of his clothes at Tikieta's house, which Tikieta allowed, but she told him that he could not stay there. One of Tikieta's friends later arrived at the house and gave her and Greene a ride to a car dealership where Tikieta purchased a car. Tikieta and Greene returned to her house, and she showed the new car to her family. Greene played basketball by himself on the patio at the rear of the house. The family eventually went inside the house and sat in the living room together to socialize. From inside the house, a large window looked out to the patio where Greene continued to play basketball.

As was his daily custom, the victim arrived at the house around 8 p.m. to drop off his and Tikieta's fifteen-year-old son, Dierre Williams. The victim parked his car in the driveway at the side of the house, and he remained there while Dierre went in the back door of the house, which was located close to the basketball goal where Greene was playing. Once inside, Dierre asked if anyone could provide the victim with change for a $100 bill. No one responded that they could, and Tikieta told Dierre to ask the victim in. The victim came in through the back door, and Tikieta informed him of a meeting they had to attend the next morning. After two to three minutes, the victim exited the back door. Within one to two minutes of the victim's exit, Bridgette Carmichael, one of Tikieta's daughters, realized she had change and called the victim back in the house. The victim returned inside the house, exchanged money with Ms. Carmichael, and again went to the back door. As the victim began to step out the door, Greene attacked the victim, grabbing the victim by wrapping his arms around the victim's midsection and pushing him into the house. When Greene did this, he said to the victim, "I told you not to come back here." As the two men were "tussling," it appeared as though Greene was punching the victim. Greene had pushed the victim against a wall such that the victim was unable to fight back. In a matter of seconds, everyone in the house ran to separate them. Once free of Greene, the victim picked up a small end table that was nearby as though to throw it at Greene. Instead, the victim looked at the children in the room and then set the table down. The victim walked out the door and to his car, and several children followed him. Greene remained inside. One of the

---

[1]Because many of the witnesses share the same surname, we refer to them by their first names for clarity. We mean no disrespect.

children soon returned and said that Greene had stabbed the victim. Tikieta went outside to the victim's car and saw him face down in the passenger seat. He was breathing but unresponsive, and Tikieta and others called 911 for help. Greene left the house on foot when Tikieta went to the victim's car.

Tikieta testified that the victim did not have a weapon at the time of the fight. Greene, however, had a pocket knife that he would always carry with him. She was not aware of any words being exchanged between the victim and Greene while the victim was at the house, and the victim did not say anything to Greene during the fight. The victim also was not arguing with anyone else at the house.

Approximately one and a half years before this incident, Greene and the victim had a verbal altercation. At a barbecue at Tikieta's house, the two men "passed words" after the victim gave Tikieta some money, but the altercation did not become physical. She did not see or hear how the argument between the men started, but she recalled telling the victim to leave the barbecue. Tikieta testified that they did not have any further altercations before the day of the victim's death.

Tikieta reviewed a number of photographs, admitted as exhibits at trial, that depicted the interior and exterior of her house and the relative locations of the patio, the basketball goal, the back door, the area where the fight occurred, and the victim's car.

On cross-examination, Tikieta acknowledged that she previously testified that Greene had lived at her house as recently as two months before the homicide. She maintained, however, that it had been longer than two months. She conceded that she previously testified that the altercation between the victim and Greene occurred seven months before the homicide. Tikieta further acknowledged that she may have told the police that the victim threw the table, but she maintained at trial that the victim did not do so.

When Greene attacked the victim, Tikieta was sitting on a couch and could see the back door. She was unsure how many times she saw Greene punch the victim, and she did not realize that the victim had been stabbed until after the fight. Tikieta identified a floor plan of the house, which was admitted as an exhibit.

Bridgette Carmichael, Tikieta's daughter, testified that although she was not biologically related to the victim, she knew him as a father. She, along with her son and fiancé, lived at Tikieta's Rosemont residence for approximately six to eight months until they moved out one month before the homicide. Greene did not live at the residence during the time Ms. Carmichael lived there, but he would sometimes visit. She testified that she was not "comfortable" with Greene and that she would not have lived there with him.

On February 11, 2009, Ms. Carmichael arrived at Tikieta's house with her son and fiancé at approximately 3:30 p.m. No one else was at the home until Tikieta arrived with Greene at approximately 5 p.m. She was surprised to see Greene there, and she had not seen him since she moved out of the house a month earlier. Ms. Carmichael's trial testimony of the attack on the victim was consistent with that of Tikieta. She further observed that Greene made a punching motion more than once. As the family separated Greene and the victim, Greene cut Dierre's hand. Ms. Carmichael did not see a knife, but she testified that Greene "always had little pocket knives." Greene and the victim did not speak to each other before the fight.

On cross-examination, Ms. Carmichael testified that the previous altercation between Greene and the victim occurred while Greene lived at Tikieta's house, approximately six months before the victim's death.

Mya Williams, one of Tikieta's daughters, testified that the victim had been like a father to her all her life and that she would see him on a daily basis. On the evening of the date in question, Mya was inside with her family when the victim called Tikieta to tell her he would be there at around 7:30 or 8 p.m. When the victim and Dierre arrived, Mya went outside to the victim's car. Greene was outside playing basketball at the time. Dierre went inside, and Mya stayed outside with the victim. Dierre soon returned, and the victim and Dierre went inside the house. Mya remained outside, and she did not hear the victim and Greene speak to each other. She soon heard screaming, and she ran to the house, where she saw everyone grabbing Greene. Greene had a "medium-sized little pocket knife," and "he was getting ready to fold it back up and put it in his sleeve." Greene said, "I told you I was going to get that nigga." The victim walked out the door, and Mya followed him to his car. The victim got in his car and reached to start it, but his arm fell back down to his side. Dierre and Mya asked the victim what was wrong, and the victim said, "I'm hit." Mya opened the victim's shirt and realized that he had been stabbed. Dierre moved the victim to the passenger side of the car and tried to start the car to take the victim to the hospital. Mya prevented Dierre from leaving and convinced him to wait for an ambulance.

Mya testified that the victim was approximately two inches taller than Greene, and he outweighed Greene due to his "belly." Greene was younger than the victim.

On cross-examination, Mya testified that the victim still cared for Tikieta. She had never seen Greene and the victim argue before.

Tommie Braddox testified that he lived at 760 Rosemont, next door to Tikieta's house. He was at Tikieta's house visiting with the family at the time of the victim's death. His account was substantially similar to that of the previous trial witnesses. He testified that as

the victim was leaving the house after exchanging money with Ms. Carmichael, Greene "ambushed" him. Mr. Braddox saw Greene punch the victim, and he did not see anything in Greene's hand. Greene and the victim had not been arguing before the fight began.

On cross-examination, Mr. Braddox testified that the victim only came in the house one time. He testified that Greene had lived at Tikieta's house but that he had not lived there recently before the date in question. The previous argument between the victim and Greene occurred in the summer of 2008.

Jarvis Williams testified that he lived at 760 Rosemont next door to Tikieta's house. He was at Tikieta's house all afternoon and evening on the date in question. He testified that Greene was inside the house until Dierre arrived. At that time, Greene went to the back yard to play basketball. In all other respects, Jarvis's direct testimony was consistent with that of the other witnesses. He testified on cross-examination that Greene lived at the house at the time of the victim's death and that he had lived there since Tikieta moved there.

Officer Lee Potts of the Memphis Police Department testified that when he arrived at the scene on the date in question, he saw a black male in a car parked in the driveway. The man was face down in the passenger seat, and he was unresponsive and not breathing. Officer Potts, who was previously an emergency medical technician with the Memphis Fire Department and a licensed nurse, determined that the victim was dead. He called for an ambulance, directed his partner to secure the scene, and went inside the house to learn what had happened.

Dr. Marco Ross of the Shelby County Medical Examiner's Office testified that he performed an autopsy on the victim.[2] He found three recent wounds on the victim's body: an abrasion on the right side of the back, a small scrape on the right side of the chin, and a stab wound on the abdomen below and to the left of the belly button. The stab wound was three-fourths of an inch long and four to five inches deep. The wound penetrated the abdominal cavity, perforated the small intestine and the mesentery, and cut the left common iliac artery. Dr. Ross found approximately two quarts of blood in the abdomen as a result of the stab wound. He observed that both ends of the wound on the skin had a "squared-off appearance," and he concluded that a knife blade had been inserted to the depth of the knife handle. He explained, "Most knife blades, either single[-] or double-edged blades, will usually terminate into, but the sharp part disappears and becomes just a blunt part of blade just before it enters the handle area . . . ." He estimated that the blade would have been three to six inches long. The wound was consistent with one that a pocket knife might cause in a

---

[2]Because Dr. Ross was unavailable at trial, a video recording of his deposition testimony was played for the jury.

single thrust. It was inconsistent with multiple thrusts of a knife. A toxicology test revealed that marijuana was present in the victim's body. Based on Dr. Ross's observations, he determined that the victim's cause of death was a stab wound to the abdomen and that the manner of death was homicide. A copy of Dr. Ross's autopsy report and several photographs depicting the victim's wounds were admitted as exhibits at trial.

On cross-examination, Dr. Ross testified that he observed no evidence that the knife was twisted in the victim, and the stab wound penetrated from front to back and slightly upward. According to Dr. Ross, it would be uncommon for a single stab wound to the lower abdomen to cause death. Although he was unable to draw any conclusions regarding the cause of the other wounds, Dr. Ross opined that they were not defensive wounds. The toxicology report indicated that the victim had likely ingested marijuana within the last twenty-four hours, but Dr. Ross could not more specifically limit the time frame of ingestion.

Lakeydra Brown, Greene's sister, testified for the defense that in 2006, she lived at 773 Rosemont. Greene and Tikieta lived there with Lakeydra and her husband, Marcus Brown, for approximately one and a half months. Greene and Tikieta moved out when Tikieta bought the house across the street. Lakeydra was aware that Greene and the victim had an argument approximately three or four months before September 2008, when the Browns moved from their house on Rosemont. After the argument, Greene would avoid contact with the victim. When the victim would go to Tikieta's house, Greene would go to the Browns' house. On cross-examination, Lakeydra testified that the victim continued to go to Tikieta's house after the argument with Greene and that he was not prohibited from doing so.

Marcus Brown also testified for the defense, and he provided substantially the same testimony as Lakeydra. He added that the reason Greene would go to the Browns' house when the victim was at Tikieta's house was to allow Dierre and the victim time together.

After trial, the jury convicted Greene of first degree premeditated murder. This timely appeal followed.

## ANALYSIS

**I. Sufficiency of the Evidence.** Greene argues that the evidence, specifically of premeditation and intent, was insufficient to support a verdict of guilt beyond a reasonable doubt for first degree premeditated murder. He asserts that the circumstances surrounding the offense instead "indicate[] an act committed in the heat of passion, if not self[-]defense." The State responds that the evidence was sufficient to support the jury's guilty verdict. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The Tennessee Supreme Court has stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

First degree murder is the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2006). The statute defines "premeditation":

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). A person's actions are "intentional" if it is the person's "conscious objective or desire to . . . cause the result." Id. § 39-11-106(a)(18).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing State v. Brown, 836 S.W.2d 530, 539 (Tenn. 1992)). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. Bland, 958 S.W.2d at 660 (citing Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). The jury may also infer premeditation from the defendant's plans related to the murder that occur prior to the killing, from evidence regarding the defendant's motive, and from the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

Viewed in the light most favorable to the State, the evidence sufficiently established premeditation and intent necessary to convict Greene of first degree premeditated murder. According to the State's witnesses, Greene, entirely unprovoked, drew a pocket knife and waited in ambush for the victim outside Tikieta Williams's back door. As the unarmed victim exited, Greene rushed him and said, "I told you not to come back here." Greene wrapped his arms around the victim and pinned him against a wall, preventing the victim from defending himself. Greene stabbed the victim in the abdomen during the fight. After the men were separated, Greene said, "I told you I was going to get that nigga." The victim walked to his car and soon died as a result of the stab wound.

This evidence demonstrates circumstances that give rise to an inference that Greene acted with premeditation and intent. First, Greene deliberately prepared for the murder in advance. He positioned himself immediately outside the door, pulled out a pocket knife, unfolded the blade, and waited for the victim to exit. Second, Greene acted without provocation. Mya Williams, who was outside when the victim passed Greene to enter the house, testified that the two men did not speak to each other. Other witnesses testified that the men were not arguing before the attack. Third, Greene used a deadly weapon, his knife, on an unarmed victim. Multiple witnesses testified that Greene typically carried a knife, and Mya saw Greene with a knife after the fight. On the other hand, no one saw the victim with a weapon of any sort. Finally, the State offered evidence of various motives for the killing. The jury could have inferred from the circumstances that Greene acted with a purpose to kill the victim in order to carry out a threat "to get" the victim or to finish the earlier verbal dispute that arose between the men at a barbecue. The jury also could have inferred that Greene acted out of jealousy to eliminate a perceived rival for Tikieta's affection at a time when the victim continued a relationship with Tikieta but Greene himself was not welcome in her house. The facts and circumstances surrounding this offense were sufficient to allow the jury to infer that the killing was premeditated and intentional. We conclude, therefore, that the State offered sufficient evidence for any rational trier of fact to find Greene guilty

of first degree premeditated murder beyond a reasonable doubt. Greene is not entitled to relief on this issue.

**II. Self-Defense Jury Instruction.** Greene argues that the trial court erred in denying his request to instruct the jury on self-defense. Although he concedes that "the exact moment of the confrontation [between Greene and the victim] does not evoke self-defense," he asserts that "the entirety of the events leading up to the incident could add up to self-defense to a rational trier of fact." In support, Greene points to the facts that both men had a prior romantic relationship with Tikieta Williams, that they had previously engaged in a verbal dispute, and that the victim was larger than Greene. The State responds that the trial court properly refused to instruct the jury regarding self-defense because "the record is void of any proof that would suggest to a reasonable person that [Greene] needed to protect himself against the victim's use or attempted use of unlawful force." We agree with the State.

The right to trial by jury is guaranteed by the United States and Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. Proceeding from this right to a jury trial is a defendant's "right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000) (citing State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001) (citing Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975); State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998)). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987) (citing Abbot v. Am. Honda Motor Co., 682 S.W.2d 206, 209 (Tenn. Ct. App. 1984)); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). "A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)). Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

As relevant here, Tennessee Code Annotated section 39-11-611(b)(2) provided for the defense of self-defense at the time of Greene's offense as follows:

[A] person who is not engaged in unlawful activity and is in a place where such person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2) (2008). Acts committed in self-defense are justified, and self-defense is a complete defense to crimes of violence. See T.C.A. § 39-11-601; State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "Reliance on self-defense is not limited to the exact moment of the assault [but] may be considered in connection with the entirety of the events leading to the assault." Ivy, 868 S.W.2d at 727 (citing Allsup v. State, 73 Tenn. 362 (1880)).

Here, in a hearing outside the presence of the jury, the trial court considered Greene's request for a jury instruction on self-defense. It reviewed the trial evidence and the requirements for self-defense, and it determined that self-defense was not applicable. The court concluded:

In the light . . . most favorable to the Defendant, I see absolutely no proof in this record that would give me any reason to believe that Mr. Greene was in fear or that Mr. Greene was acting in fear or that Mr. Greene was acting, you know, to protect himself, acting in any way in self-defense . . . .

The record supports the trial court's refusal to instruct the jury on self-defense. Absent from the proof at trial was any evidence that the victim posed a danger–much less an imminent one–to Greene, that Greene believed he was in imminent danger, or that any such belief was reasonable. Rather, the proof on the circumstances surrounding the murder demonstrated that Greene attacked and killed the victim without provocation. Furthermore, a consideration of the entirety of the events before the murder, including the prior argument between Greene and the victim and the fact that they both had previously maintained a romantic relationship with Tikieta Williams, avails Greene little. Although these facts demonstrate that some degree of tension existed between the two men, there is no evidence that the victim threatened violence against Greene at any point in time or otherwise posed a danger such that Greene's deadly attack on the victim could be justified. Finally, the fact that

-10-

the victim may have been marginally larger than Greene could only be relevant to a claim of self-defense under these circumstances when considered in conjunction with other evidence that the victim posed some form of danger or that Greene believed he posed a danger. Such evidence is lacking here. We conclude, therefore, that the parties offered no evidence at trial that reasonable minds could have accepted in support of self-defense, and the trial court did not err in denying Greene's request to instruct the jury on self-defense. Consequently, Greene is not entitled to relief.

## CONCLUSION

Upon review, we affirm the judgment of the trial court.


_____
CAMILLE R. McMULLEN, JUDGE